UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


United States of America,                                    Case No. 3:20-cr-354

                    Plaintiff,

        v.                                                   MEMORANDUM OPINION
                                                                  AND ORDER

Antonio Banks,
                    Defendant.


## I.    INTRODUCTION

On December 7, 2023, a jury found Antonio Banks guilty of knowingly possessing a firearm

as a convicted felon in violation of 18 U.S.C. § 922(g)(1).  (Doc. No. 41).  On July 3, 2024, after the

trial but before his sentencing, Banks filed a motion to dismiss the sole count of his indictment,

arguing it is unconstitutional under the Second Amendment.  (*See* Doc. No. 59).  The government

opposed the motion, (Doc. No. 60), and Banks filed a brief in reply.  (Doc. No 63).

Two weeks after the parties completed their initial briefing on Banks's motion, the United

States Court of Appeals for the Sixth Circuit decided *United States v. Williams*, 113 F.4th 637 (6th Cir.

2024), which established a framework for evaluating as-applied challenges to § 922(g)(1) under the

Second Amendment.  *See Williams*, 113 F.4th at 657-62.  In light of this new precedent, I gave the

parties the opportunity to submit additional briefing.  (*See* non-document order dated August 28,

2024).  Banks and the government each filed a supplemental brief.  (*See* Doc. Nos. 66 & 69).

Thereafter, I held three telephone conferences with the parties to discuss the status of their briefing.

(*See* non-document orders dated February 29, 2025, March 4, 2025, & April 14, 2025).  On May 30, 2025, I held a hearing on the record during which the parties had the opportunity to offer additional evidence and submit additional argument.  (*See* non-document order dated May 30, 2025).  I took Banks's motion under consideration at that time.  For the reasons that follow, I grant Banks's motion and dismiss the indictment.

## II.    BACKGROUND

Between April 10, 2016, and September 23, 2016, Banks possessed a Palmetto State Armory Model-15 5.56mm AR-style pistol ("PSA Model-15").  (*See* Doc. No. 1 at 2; Doc. No. 41).  At trial, Banks stipulated to having been previously convicted of an offense punishable by imprisonment for more than one year at the time of the alleged firearm possession, as required for a conviction under 18 U.S.C. § 922(g)(1).  (*See* Doc. No. 62 at 128).  That offense was an August 2007 conviction for attempted possession of between 5 and 10 grams of crack cocaine, a fourth-degree felony in Ohio.[1] (*See* Doc. No. 66-1).

---

[1] Possession of cocaine in violation of § 2925.11(C)(4)(c) was a third degree felony under Ohio law when Banks was convicted.  A violation of § 2925.11(C)(4)(c) is a third-degree felony today as well. *See* Ohio Rev. C. §§ 2925.11(A) and (C)(4)(c).  But because Banks was convicted of *attempted* possession, Ohio law treated his conduct more leniently.  Under Ohio Revised Code § 2923.02(E)(1), the degree of his attempt offense was "an offense of the same degree as the . . . offense attempted would be if that . . . offense had been committed and had involved an amount . . . of the controlled substance that is within the next lower range of controlled substance amounts than was involved in the attempt."  Ohio Rev. C. § 2923.02(E)(1).

In 2007, the subsection under which Banks was convicted indicated he attempted to possess between 5 and 10 grams of crack cocaine.  *Compare* Substitute S.B. 154 at 31, 126th Gen. Assemb. (Ohio 2006) (effective May 17, 2006) (providing, at the time of Banks' attempted possession offense, that § 2925.11(C)(4)(c) prohibits the possession of between 5 and 10 grams of crack cocaine) *with* Amended Substitute H.B. 86 at 2, 229, 129th Gen. Assemb. (Ohio 2011) (effective Sept. 30, 2011) (eliminating the penalty disparity for crack and powder cocaine by amending § 2925.11(C)(4)(c) to provide a single penalty for possession of between 10 and 20 grams of cocaine of any type).  The "next lower range of controlled substance amounts" for Banks's offense, at that time, was between 1 and 5 grams of crack cocaine—§ 2925.11(C)(4)(b)—which corresponded to a fourth degree felony. *See* Substitute S.B. 154 at 31, 126th Gen. Assemb. (Ohio 2006).  Thus, Banks's 2007 conviction was a fourth degree felony, not a third-degree felony, and he was convicted of attempting to possess between 5 and 10 grams of crack cocaine, not between 10 and 20 grams of cocaine.

The evidence at trial showed that Banks's associate, Deonte Bryant, purchased the gun charged in the indictment at the Maumee Valley Gun Collectors Association gun show on April 10, 2016.  (*See* Doc. No. 61 at 78-80, 89).  Video footage taken that day and later posted to Instagram depicted Bryant and Banks in a car with the PSA Model-15—in its original box, sales tag visible— discussing their purchase.  (*See id.* at 97-101, 167-68).  The footage also showed a different gun, a handgun, resting on top of the PSA Model-15 box.  (*See id.* at 99, 171-72).  Another video taken that same day depicted Banks holding what appeared to be a shotgun with a laser light attached, along with Bryant holding an AR-style pistol with a drum magazine and a laser light attached.  (*See id.* at 151-52, 168).  Still photographs posted to Banks's Instagram account on April 22, 2016 and May 28, 2016 showed Banks holding an AR-style pistol later identified as the PSA Model-15 purchased on April 10, 2016.  (*See id.* at 177-78, 182-83).

Banks is a recording artist under the name "AocObama," and his music career generated a piece of significant evidence used against him at trial.  On September 23, 2016, Banks appeared in a music video for one of his songs, "Every Day," holding the same PSA Model-15 purchased by Deonte Bryant on April 10, 2016, along with two other firearms.  (*See id.* at 102, 133-34, 188-90).[2] The jury convicted Banks based on this evidence.  (*See* Doc. No. 41).

### III.  ANALYSIS

Banks brings only an as-applied challenge to his prosecution under § 922(g)(1).  (*See* Doc. No. 59 at 3; Doc. No. 66 at 2).  *Williams* and subsequent Sixth Circuit precedent govern this question.  *See United States v. Parham*, 119 F.4th 488, 495 n.4 (6th Cir. 2024); *United States v. Goins*, 118 F.4th 794, 804 (6th Cir. 2024).

---

[2]  The music video is available on YouTube at
https://www.youtube.com/watch?v=_qINEwUcWyA&ab_channel=AocObamaOfficial.

## A.    The *Williams* As-Applied Framework

*Williams* addressed a facial and an as-applied challenge to § 922(g)(1) under the Second Amendment after the Supreme Court's landmark decisions in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024).  *See Williams*, 113 F.4th at 648.  The two-part test inaugurated in *Bruen*, and refined in *Rahimi*, "first ask[s] whether 'the Second Amendment's plain text' covers" the conduct in question.  *Id.* (quoting *Bruen*, 597 U.S. at 24).  If so, "[t]he government must then justify its regulation of that conduct by demonstrating that the regulation 'is consistent with the Nation's historical tradition of firearm regulation.'"  *Id.  Williams* held that the Second Amendment's text "presumptively protects" a felon's right to "possess a gun." 113 F.4th at 649.  Then, it held that § 922(g)(1) is constitutional on its face because the American history and tradition of firearms regulation permits a legislature to disarm "groups that they deem[] to be dangerous."  *Id.* at 657.

Because § 922(g)(1) is facially constitutional under the Second Amendment, a "class-wide presumption" of constitutionality applies to prosecutions initiated under the statute.  *Id.*  Therefore, a defendant bringing an as-applied challenge bears the burden "to show he's not dangerous;" the government need not affirmatively establish a defendant's dangerousness.  *Id.* at 662.  Nevertheless, "history shows that § 922(g)(1) might be susceptible to an as-applied challenge in certain cases."  *Id* at 657.

The dangerousness analysis "focus[es] on each individual's specific characteristics" and takes into consideration "the individual's entire criminal record."  *Williams*, 113 F.4th at 657.  This includes "any evidence of past convictions in the record, as well as other judicially noticeable information."  *Id.* at 660.  But this is no "categorical" inquiry.  *Williams*, 113 F.4th at 660 (citing *Mathis v. United States*, 579 U.S. 500, 504 (2016), by way of counterexample).  Instead, "[t]he dangerousness determination will be fact-specific, depending on the unique circumstances of the

4

individual defendant." *Williams*, 113 F.4th at 660; *see also Goins*, 118 F.4th at 805 (considering the "totality of the facts" related to the defendant's criminal history). Beyond "the fact of conviction alone," a court "may consider how an offense was committed." *United States v. Morton*, 123 F.4th 492, 499 (6th Cir. 2024). This task also involves the exercise of judicial common sense, such as a court's "informed judgment about how criminals commonly operate." *Williams*, 113 F.4th at 660 (internal citation and quotation marks omitted).

*Williams* analyzed three classes of prior convictions. First, "crimes against the person," including many common law felonies like rape, murder, and robbery, "speak directly to whether a person is dangerous" in the Second Amendment context. *Id.* at 658. While *Williams* formally left undecided whether "crimes in this bucket are dispositive," a defendant with a prior conviction for a crime directly involving physical harm or a serious physical threat carries an "extremely heavy" burden to disprove their presumed dangerousness. *Id.* In fact, dangerousness may be "self-evident" from a prior conviction falling in this category. *Id.* at 660. For example, the Sixth Circuit has concluded that a defendant previously convicted of an "attempted second-degree murder offense [which] involved shooting a young child" was "exactly the type of individual our history and tradition allow Congress to disarm." *Parham*, 119 F.4th at 496.

The second class of offenses are "not strictly crimes against the person" but "may nonetheless pose a significant threat of danger. These crimes do not always involve an immediate and direct threat of violence against a particular person," but "most of [them] put someone's safety at risk, and thus, justify a finding of danger." *Williams*, 113 F.4th at 659.

One example is "drug trafficking," which "poses a danger to the community" and "often leads to violence." *Williams*, 113 F.4th at 659 (quoting *United States v. Stone*, 608 F.3d 939, 947 n.6 (6th Cir. 2010)) (internal citation and quotation marks omitted). Another is burglary, which "creates the possibility of a violent confrontation between the offender and occupant." *Williams*, 113 F.4th at

659 (quoting *Taylor v. United States*, 495 U.S. 575, 588 (1990)) (internal quotation marks omitted). Consistent with this rationale, the Sixth Circuit has found that four prior convictions for driving under the influence, including one incident resulting in a motor vehicle accident, evinced a "dangerous pattern" of behavior that "pose[d] a danger to public safety" and thus supported a finding that § 922(g)(1) was constitutional as applied to that defendant. *Goins*, 118 F.4th at 804.

The final category of crimes includes those which "cause no physical harm to another person or the community." *Williams*, 113 F.4th at 659. Unlike the first two classes of offenses, "many of these crimes," such as mail fraud or making false statements, "don't make a person dangerous." *Id.*

In all, the gravamen of *Williams*'s dangerousness analysis is physical harm to others. A criminal record containing a conviction for an offense directly involving significant physical harm to one or more persons is very likely to make that defendant dangerous enough to be disarmed under the Second Amendment, while a record involving only convictions that are highly attenuated from such harm is unlikely to render that defendant dangerous. *See Williams*, 113 F.4th at 657-60. Further, a pattern of conduct risking or causing physical harm strengthens the inference that a defendant is dangerous enough to be prosecuted under § 922(g)(1). *See Goins*, 118 F.4th at 804; *Parham*, 119 F.4th at 495-96.

**B.    Preliminary Evidentiary Questions**

Before analyzing Banks's conduct, I address three related preliminary questions: (1) what sort of evidence I will consider in assessing dangerousness, (2) at what point in time a person's dangerousness should be measured under *Williams*, and (3) which standard of proof applies to Banks's burden under *Williams*.

6

1.      **Evidence Under Consideration**

*Williams* expressly left an array of evidentiary questions "for another day." 113 F.4th at 658

n.12. But *Williams* used the language of ordinary factfinding to describe its inquiry. It explained, for

example, that "certain categories of past convictions are *highly probative* of dangerousness," and it left

open the question of "what information is *relevant*" to this analysis. 113 F.4th at 658 & n.12

(emphasis added). It also compared as-applied challenges under § 922(g)(1) to findings of fact made

by judges under the Bail Reform Act and at sentencing. *See id.* at 657. This supports the application

of basic factfinding principles to the question of Banks's dangerousness.[3]

The *Williams* court also "recognize[d] that courts may wish to consider information beyond

criminal convictions when assessing a defendant's dangerousness," noting that the Supreme Court,

in *Rahimi*, had considered a state-court-issued civil restraining order. *Williams*, 113 F.4th at 658 n.12

(citing *Rahimi*, 602 U.S. at 686-87). This includes the judicially-noticeable information available on

the dockets for Banks's various convictions. *See Williams*, 113 F.4th at 657, 658 n.12; *Goins*, 118

F.4th at 804 (considering the defendant's four prior DUI convictions, two public intoxication

convictions, and two driving with a suspended license convictions, including that one of the DUI

convictions "resulted in a motor vehicle accident"); *Parham*, 119 F.4th at 496 (considering that the

defendant's "attempted second-degree murder offense involved shooting a young child"); *Morton*,

---

[3]  *Williams* did not address whether the Federal Rules of Evidence should apply to a proceeding to
determine a defendant's dangerousness. *See* 113 F.4th at 658 n.12; Fed. R. Evid. 1101. Neither
party addressed this question head-on, and neither party objected under the Federal Rules of
Evidence to my consideration of any of the evidentiary submissions in this case. (*See* Doc. Nos. 59,
60, 63, 66 & 69.) As I explain below, Banks has carried his burden under *Williams* because the
judicially-noticeable record evidence related to his criminal convictions shows he is not dangerous.
That is, the outcome of Banks's motion would not change regardless whether the Federal Rules of
Evidence apply to evidence offered pursuant to a *Williams* motion. Therefore, I need not, and do
not, address whether the Federal Rules of Evidence apply. *Cf. United States v. Young*, Case No. 6:24-
CR-025, 2025 WL 627207, at *7-8 (E.D. Ky. Feb. 26, 2025) (holding an evidentiary hearing and
receiving evidence from the parties, including testimony, but declining to decide whether the Federal
Rules of Evidence apply to a *Williams* proceeding).

123 F.4th at 500 (approving the district court's reliance on "state court judgments . . . attached as exhibits"). A fact is judicially noticeable if it "is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Therefore, following *Williams*'s guidance, and given the briefing and argument by the parties discussed below, I will consider Banks's criminal record and any underlying facts to the extent they are judicially noticeable.

In addition to the judicially noticeable information on the dockets of Banks's prior convictions, the record in this case includes a presentence report and several attachments offered by Banks that purport to show his good character. (*See* Doc. Nos. 55 & 66-2). Banks submitted several objections to the presentence report which have not been conclusively resolved. (*See* Doc. No. 55 at 27-30). To the extent the information in the presentence report is consistent with judicially-noticeable information on the public dockets for Banks's convictions, and to the extent the presentence report contains information to which there has been no objection, I will consider it. *See Williams*, 113 F.4th at 662 (relying on details from the defendant's presentence report to which he "never objected").

The presentence report also includes information about a violation of the conditions of Banks's presentence release. (*See* Doc. No. 55 at 3-4). Banks admitted to the violation. (*See* non-document order dated April 18, 2024). During that incident, on January 31, 2024, Banks was stopped by a DEA agent at the Detroit Metropolitan Airport as he attempted to board a flight to Los Angeles, California. (*See* Doc. No. 55 at 3). Banks walked quickly away from the agent and did not board the flight. (*See id.*). That same day, Banks was in a vehicle driven by another person when that vehicle was stopped for improper plates, and police found $133,597 in cash in the vehicle. (*See id.*).

8

Banks initially claimed ownership of the money, and an associate of Banks's, Ronald Goolsby, later told police that the money came from a shared account attributable to a car sales business jointly owned by Banks and Goolsby. (*See id.* at 3-4). Goolsby told police that Banks had planned to travel to Los Angeles to attend the Video Music Awards and to potentially purchase cars afterwards, and that Banks walked away from the DEA agent because he was a celebrity who did not want to be embarrassed. (*See id.* at 4). No criminal charges resulted from the violation. I did not order any change in Banks's presentence release as a result of this incident. (*See* non-document order dated April 18, 2024).

Banks submitted 16 additional documents as attachments to his supplemental briefing. (*See* Doc. No. 66-2). The Sixth Circuit has suggested that a defendant may offer relevant evidence of non-dangerous good behavior to help carry their burden under *Williams*. *See United States v. Vaughn*, Case No. 23-5790, 2024 WL 4615853, at *2 (6th Cir. Oct. 30, 2024) (noting the lack of "countervailing evidence" offered by the defendant to support a *Williams* motion). Unfortunately, I cannot credit Banks's submissions. Most are screenshots of social media posts devoid of context. (*See* Doc. No. 66-2 at 4-7, 12-16). The others appear to be screenshots of news articles and other documents discussing a march or rally to oppose gun violence in the Toledo area. (*See id.* at 1, 3, 8). Two documents appear to be letters in support of Banks's good character, and both generally applaud his financial contributions to community events and efforts at youth mentorship. (*See id.* at 2, 11). One letter is signed but undated (*id.* at 2), and the other is dated but unsigned. (*id.* at 11). Additionally, one document describes Banks allegedly purchasing tickets for Toledo youth to attend a boxing match. (*See id.* at 9-10). The government did not object to my consideration of any of this evidence, on evidentiary grounds or otherwise.

Even assuming I can consider these documents without a formal attempt at authentication, and setting aside whether other evidentiary rules such as the limitations on character evidence and

the rule against hearsay apply, Banks's evidentiary submissions have no effect on my analysis below. *See* Fed. R. Evid. 901 (providing how a document must be authenticated); Fed. R. Evid. 404 (generally prohibiting the introduction of evidence of a character trait); Fed. R. Evid. 802 (generally prohibiting the admission of hearsay).  Banks makes no argument tying any specific document to his lack of dangerousness, and the documents themselves do not obviously relate to Banks's dangerousness.  (*See* Doc. No. 66).  Accordingly, this evidence is not relevant to my evaluation of whether Banks has carried his burden under *Williams*.

Instead, as *Williams* makes clear, Banks's criminal history forms the core of the dangerousness analysis.  *See* 113 F.4th at 657-58.  Banks's sole felony conviction was his attempted crack cocaine possession offense.  He was sentenced to 15 months in prison, securing judicial release after 6 months.  (*See* Doc. No. 55 at 10).  He completed 3 years of probation following his release on October 6, 2009.  (*See id.*).  On June 9, 2020, a judge in the Lucas County, Ohio Court of Common Pleas expunged that conviction after a hearing.  (*See* Doc. No. 66-1).  No other judicially-noticeable information about that offense is available.

The government did not charge Banks until July 1, 2020, four years after he possessed the firearm alleged in the indictment and weeks after his expungement took effect.  (*See* Doc. No. 1). The government has conceded that "had Banks expunged his conviction prior to possessing the firearm in this case . . . he would not be liable under 18 U.S.C. 922(g)(1)."  (Doc. No. 26 at 3).  But because Banks's attempted cocaine possession offense was still on the books in 2016, § 922(g)(1) barred him from possessing a firearm at that time, even though the government did not indict Banks until years later.  (*See* Doc. No. 27 at 3).

Banks encountered the criminal justice system more than just once prior to his current criminal case.  In May of 2005, when he was 19, he drove with a suspended license and was fined. *See State v. Banks*, Case No. TRD-05-13193, non-document entry dated February 7, 2006 (Toledo

Mun. Ct. 2006). On New Year's Day of 2006, when he was 20, he drove under the influence of an intoxicant and possessed an open container in a moving vehicle—two misdemeanors. *See State v. Banks*, Case No. TRC-06-00011, non-document entries dated March 22, 2006 (Toledo Mun. Ct. 2006). He was fined and served 3 days in jail. *See id.* In August of 2006, when he was 21, he drove with a suspended license. *See State v. Banks*, Case No. TRD-06-23892, non-document entry dated September 19, 2007 (Toledo Mun. Ct. 2007). He was sentenced to 180 days in custody to run concurrently with his sentence for attempted possession of crack cocaine, for which he had been sentenced in the Lucas County Court of Common Pleas just a month earlier. *See id.* (Doc. No. 66-1).

In 2008, when he was 22, Banks committed three more vehicle-related offenses: driving without a license in March, not wearing a seatbelt as a passenger in April, and driving with a suspended license in May. *See State v. Banks*, Case No. TRD-08-09261, non-document entry dated April 8, 2008, (Toledo Mun. Ct. 2008); *State v. Banks*, Case No. TRD-08-11314, non-document entry dated May 22, 2008 (Toledo Mun. Ct. 2008); *State v. Banks*, Case No. TRD-08-16091, non-document entry dated June 23, 2008 (Toledo Mun. Ct. 2008). Each offense earned him a fine and a suspended sentence. *See id.* In September of 2009, aged 23, he again drove without a license, and he was fined, given a 180-day suspended sentence, and placed on probation for a year. *See State v. Banks*, Case No. TRD-09-17965, non-document entry dated February 24, 2011 (Toledo Mun. Ct. 2011).

In August of 2010, when he was 24, Banks drove while intoxicated for a second time— another misdemeanor. *See State v. Banks*, Case No. TRC-10-16444, non-document entry dated February 24, 2011 (Toledo Mun. Ct. 2011). He was fined and served 5 days in jail. *See id.* In February of 2011, when he was 25, he again drove without a license and carried an open container of alcohol. *See State v. Banks*, Case No. TRD-11-02990, non-document entries dated June 22, 2011 (Toledo Mun. Ct. 2011). In November of that same year, he again carried an open container of

alcohol in a prohibited public place. *See State v. Banks*, Case No. TRD-11-26989, non-document

entry dated March 26, 2012 (Toledo Mun. Ct. 2012). He was fined. *See id.*

Four years later, in August of 2016, Banks again drove without a license and was fined. *See*

*State v. Banks*, Case No. TRD-16-22023, non-document entry dated March 10, 2017 (Toledo Mun.

Ct. 2017). He was 31. In January of 2018, at the age of 32, he engaged in the construction of a

building without a permit and was fined. *See State v. Banks*, Case No. CRB-18-13061, non-document

entry dated April 17, 2019 (Toledo Mun. Ct. 2019). Finally, in November of 2023, at the age of 37,

he drove without a license and was fined. *See State v. Banks*, Case No. TRD-23-17020, non-

document entry dated December 22, 2023 (Toledo Mun. Ct. 2023).

By September of 2016, when he possessed a firearm, Banks had been convicted of 13

automobile-related misdemeanors and a single fourth-degree felony: attempted possession of crack

cocaine. He served 6 months in prison for the felony, along with a total of 8 days in jail for all his

misdemeanors combined. Since then, his felony conviction has been expunged, and he has added

one conviction for a building-code violation and another for driving without a license.

## 2. At What Point in Time Dangerousness is Measured

During oral argument, the parties discussed the point in time at which Banks's

dangerousness should be measured under the *Williams* inquiry. The lengthy procedural history of

this case makes it prudent to answer this question. Banks possessed his firearm in 2016, he was

indicted in 2020, he was convicted in 2023, and it is now the summer of 2025. Nearly a decade has

passed since Banks committed his firearm possession offense. As I have explained, the judicially-

noticeable information about Banks's criminal record, and the parties' other evidentiary offerings,

cover behavior ranging from 2005 to 2024. The felony offense underlying Banks's § 922(g)(1)

prosecution was expunged by the time he was indicted, but not when he possessed the firearm in

question. The long gap between the commission of the offense and Banks's conviction, along with

12

the unusual change in Banks's criminal record during that time, suggests that the relative weight and probative value of the evidence in the record could vary depending on when Banks's dangerousness ought to be measured.

For several reasons, I conclude the appropriate question under *Williams* is whether Banks was sufficiently dangerous at the time he possessed a firearm in 2016. First is the nature of the case and the relief Banks seeks. A party bringing an as-applied challenge to a statute "contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional." *Women's Med. Pro. Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir. 1997). The government prosecuted Banks for possession of a Palmetto State Armory Model-15 5.56mm pistol between April 10, 2016 and September 23, 2016, in violation of 18 U.S.C. 922(g)(1). (*See* Doc. No. 1 at 1). Banks's as-applied challenge contends the Second Amendment immunizes him from prosecution for this conduct. (*See* Doc. No. 59 at 3-4; Doc. No. 66 at 4-5). This suggests the focus of the *Williams* analysis ought to be Banks's tendency toward dangerousness at the time he engaged in the conduct for which he seeks constitutional protection.

Second, precedent, including *Williams*, supports this framing. *Williams*'s "study" of the relevant history and tradition of American firearms regulation "reveal[ed] that governments in England and colonial America long disarmed groups that they deemed to be dangerous," but that members of those groups "could demonstrate that *their particular possession of a weapon* posed no danger to peace." 113 F.4th at 656. *Williams* also emphasized the salience of "*prior* convictions," which likewise suggests a focus on the defendant's behavioral record leading up to the conduct for which they are under indictment. *Id.* at 660 (emphasis added). This indicates the dangerousness analysis is not just person-specific, but circumstance-specific as well.

Moreover, in *United States v. Fordham*, where the defendant pled guilty to a violation of § 922(g)(1), the Sixth Circuit focused on the conduct surrounding the charged firearms possession to

13

support its conclusion that the defendant was dangerous.  *See* Case No. 24-1491, 2025 WL 318229, at *5 (6th Cir. Jan. 28, 2025).  There, the defendant "robb[ed] two people at gunpoint and [shot] a firearm during the commission of the armed robbery" before being charged under § 922(g)(1).  *Id.*  The "violent nature . . . of the offense conduct involved in the present offense" contributed to the court's rejection of the defendant's Second Amendment challenge.  *Id.  Fordham* also suggests I should focus on whether Banks displayed the trait of dangerousness at the time the indictment alleges he possessed a firearm.

This does not mean Banks's conduct after September 23, 2016 is irrelevant to the dangerousness determination.  *Williams* discouraged such rigid and "categorical" thinking.  113 F.4th at 660.  Instead, consistent with familiar factfinding principles, the question is whether the "unique circumstances of the individual," including both the "specific conviction" underlying the indictment and the rest of Banks's "entire criminal record," make him dangerous enough to be prosecuted under § 922(g)(1).  *Williams*, 113 F.4th at 663.  So, I will consider evidence of Banks's conduct before, during, and after the period between April 10, 2016 and September 23, 2016, to the extent that evidence is relevant to Banks's dangerousness at that time.

### 3.    The Standard of Proof

During the hearing, both parties argued Banks must show he is not dangerous by a preponderance of the evidence.  *Williams* did not establish a standard of proof applicable to its "dangerousness" inquiry.  *See* 113 F.4th at 658 n.12.  No statute or rule prescribes a standard of proof to be applied here.  *Cf.* Fed. R. Crim. P. 32.1(a)(6) (providing a person held in custody for violating probation or supervised release bears the burden of establishing, by clear and convincing evidence, that they are not dangerous or a flight risk).  Absent clear guidance on this question, I find it appropriate to analogize the *Williams* dangerousness inquiry to other areas of the criminal law.

14

When a defendant mounts an affirmative defense that does not negate an element of the charged offense, they can be required to prove it by a preponderance of the evidence. *See Patterson v. New York*, 432 U.S. 197, 205-07 (1977); *United States v. Brown*, 367 F.3d 549, 556 (6th Cir. 2004).  The dangerousness analysis under *Williams* is similar.  Proof that Banks is not dangerous, for Second Amendment purposes, would not negate (1) whether he was convicted of a felony, (2) whether he knowingly possessed a firearm while under that disability, or (3) whether that firearm traveled in interstate commerce. *See United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007) (laying out the elements required to prove a violation of § 922(g)(1)).  But a finding that Banks is not dangerous would nevertheless insulate him from prosecution for this conduct.

In a related context, a defendant can suppress evidence gathered through the execution of a search warrant if they show, by a preponderance of the evidence, that an affidavit used to obtain the search warrant contains false information. *See Franks v. Delaware*, 438 U.S. 154, 156 (1978).  During a *Franks* hearing, a defendant confronts an affidavit whose contents are presumed true, and they must rebut that presumption in order to vindicate their Fourth Amendment rights. *See United States v. Rodriguez-Sauzo*, 346 F.3d 637, 648 (6th Cir. 2003).  Likewise, under *Williams*, a defendant faces a statute whose constitutionality is presumed valid, and they must rebut that presumption to vindicate their Second Amendment rights. *See Williams*, 113 F.4th at 662.  While a *Franks* hearing addresses government conduct ancillary to the charged crime itself, this rule indicates that a criminal defendant may be asked to prove constitutionally-significant facts by a preponderance of the evidence if they bear the burden of proof.

Moreover, the preponderance of the evidence is a common standard of proof in the criminal law for other questions of fact that do not prove or disprove an element of a charged offense. *See, e.g.*, *United States v. Darden-Mosby*, 101 F.4th 465, 468 (6th Cir. 2024) (2024) (noting the standard of proof in a criminal asset forfeiture hearing is a preponderance of the evidence); *Colorado v. Connelly*,

479 U.S. 157, 168 (1986) (holding that the government must show the voluntariness of a confession by a preponderance of the evidence).

At the same time, failing to apply a standard of proof that appropriately respects a criminal defendant's legal presumption of innocence can implicate procedural due process concerns.  *See Apprendi v. New Jersey*, 530 U.S. 466, 478 (2000) (explaining that the "right to have the jury verdict based on proof beyond a reasonable doubt" is deeply-rooted in the common law); *United States v. Salerno*, 481 U.S. 739, 751 (1987) (holding that the Bail Reform Act is facially constitutional under the Fifth Amendment's due process clause because it couples a "clear and convincing" evidentiary standard with adequate procedural safeguards).  With these principles in mind, and given the parties' agreement on this point, I find Banks must rebut his presumption of dangerousness by a preponderance of the evidence.

## C.    Applying *Williams* to Banks

The bare fact of Banks's prior felony conviction creates a presumption he was dangerous for purposes of his firearm possession between April 10 and September 23 of 2016.  But a closer inspection of his entire criminal record dispels that presumption.

I begin with the felony conviction itself, since this offense qualified him for prosecution under § 922(g)(1).  The government suggests Banks's attempted drug possession offense should be considered a "companion to and/or a stand in charge for drug trafficking."  (*Id.* at 2).  As a legal and practical matter, seeing Banks's conviction this way would place it squarely within the category of offenses that typically "pose a significant threat of danger" to others.  *Williams*, 113 F.4th at 659.

I am not persuaded by the government's characterization.  Even assuming a drug possession charge can be a "stand in charge for drug trafficking" under some circumstances, nothing in the record indicates this was the case for Banks's conviction.  (*See* Doc. No. 60 at 38-40; Doc. No. 69 at 2-4).  First, Banks pled guilty to *attempted* possession—the record contains no judicially-noticeable

16

facts showing Banks actually had cocaine in his control or on his person.  Second, the amount in question, between 5 and 10 grams, does not by itself show that Banks intended to distribute the drugs.  *See, e.g., United States v. Gill*, 348 F.3d 147, 156 (6th Cir. 2003) (noting the defendant's unrebutted testimony at sentencing that he personally used approximately 12 grams of cocaine over a five-week period, at a rate of 2.4 grams per week).  And because Banks's conviction was expunged, no other judicially-noticeable information about this offense is available.  On this record, I conclude Banks's attempted drug possession offense is not tantamount to drug trafficking.  Instead, the judicially-noticeable facts of his conviction indicate Banks attempted to possess a non-trafficking amount of crack cocaine.

As even the government admits, this conviction places him "on the periphery of [the] felon in possession statute."  (Doc. No. 69 at 4).  Nevertheless, Banks must still show his conviction does not support a finding of dangerousness.  *See Williams*, 113 F.4th at 662.  In addition, the government affirmatively argues that attempted possession of illegal drugs is dangerous because it "requires the drug possessor to, as a practical matter, aid and abet drug trafficking," since a person who possesses drugs "must obtain the drug from the drug trafficker."  (Doc. No. 69 at 4).  A closer examination of the differences between attempted drug possession and drug trafficking reveals why Banks's attempted cocaine possession offense does not make him dangerous in the way *Williams* envisions.

*Williams* cited the "danger to the community" caused by the enterprise of drug trafficking as a predictor of a defendant's dangerousness with respect to firearm possession.  113 F.4th at 659; *see also Lopez v. Gonzales*, 549 U.S. 47 (2006) ("ordinarily 'trafficking' means some sort of commercial dealing").  Guns can enable drug trafficking by helping a perpetrator "to protect the drugs, facilitate a drug transaction, or [by] embolden[ing] [them] while participating in felonious conduct."  *United States v. Shields*, 664 F.3d 1040, 1044 (6th Cir. 2011).  And the "dangers associated with drug trafficking," which often prompt traffickers to carry guns in case of a confrontation, are well-known.

17

*United States v. Risner*, 129 F.4th 391, 369 (6th Cir. 2025) (internal citation and quotation marks omitted).

But *Williams* drew a line between crimes which "cause no physical harm to another person or the community" and those which "pose a significant threat of danger" to others, like drug trafficking.  113 F.4th at 659.  In line with other Sixth Circuit precedent, this reasoning does not suggest that possessing illegal drugs, alone, is the kind of conduct that poses a "significant threat of danger" to others—much less attempted drug possession.  113 F.4th at 659.  As the Sixth Circuit has explained, mere drug possession is not typically characterized by the systematic spread of drugs throughout a community and is not normally accompanied by the illicit financial motivations that make violence more likely.  *See, e.g.*, *United States v. Leary*, 422 F. App'x 502, 508-09 (6th Cir. 2011) (distinguishing between a "user" and a "seller" of drugs).

Similarly, in the evidentiary context, the Sixth Circuit has concluded that prior acts of personal drug use are often not relevant to whether a defendant engaged in drug trafficking because "[o]ne activity involves the personal abuse of narcotics, the other the implementation of a commercial activity for profit.'"  *United States v. Haywood*, 280 F.3d 715, 721 (6th Cir. 2002) (quoting *United States v. Ono*, 918 F.2d 1462, 1465 (9th Cir. 1990)) (holding that the defendant's possession of cocaine for personal use on a subsequent occasion was not admissible to show his intent to distribute cocaine on a prior occasion); *see also United States v. Smith*, 20 F. App'x 258, 267 (6th Cir. 2001) (reversing a conviction for possession with intent to distribute because "[t]he government's only evidence was that Smith was a passenger in a vehicle which contained drugs likely intended for distribution.").

The important legal and factual differences between drug trafficking and drug possession thus do not permit the conclusion that Banks's attempted drug possession conviction indicates future dangerousness.  True, attempting to possess crack cocaine implies Banks tried to acquire the

drugs from someone else.  But acquiring drugs for "personal" use, while certainly unwise, "is of a wholly different order" than engaging in the buying and selling of drugs for profit, a risky and violent enterprise that makes entire communities less physically safe.  *Haywood*, 280 F.3d 715, 721 (internal citation and quotation marks omitted).  Absent any judicially-noticeable facts in the record suggesting Bank's attempted possession of crack cocaine for personal use risked or caused harm to another person, I conclude this offense did not "pose a significant threat of danger" by "put[ting] someone's safety at risk."  *Williams*, 113 F.4th at 659.

Banks's conduct after his conviction supports the conclusion that his attempted drug possession offense does not indicate he is dangerous.  While Banks was sentenced to 15 months in prison, he secured judicial release after 6 months, and his 3-year term of probation was terminated early, after a little over 18 months.  (*See* Doc. No. 55 at 10).  His relatively good behavior during and after his incarceration for his attempted drug possession offense weighs in his favor and undermines any inference of dangerousness attributable to that conviction.

Further, it is notable that Banks successfully had this conviction expunged.  (*See* Doc. No. 66-1).  The timing of the expungement reduces the probative value of this fact as it relates to Banks's dangerousness in 2016, because he secured the expungement nearly 4 years after he possessed the firearm charged in the indictment.  But the expungement does indicate that a judge examined "the events that resulted in the original charges" leading to the 2006 attempted possession offense, along with Banks's behavior since that time, and concluded expungement was warranted. *State v. Hill*, 63 N.E.3d 690, 693 (Ohio Ct. App. 2016); *see* Ohio Rev. C. § 2953.32(D)(2) (providing a judge may seal a defendant's conviction after making findings pursuant to statutory criteria, including that "the rehabilitation of the applicant has been attained to the satisfaction of the court"). Therefore, I assign the expungement some weight in Banks's favor.

The passage of time between Banks's attempted drug possession conviction and his firearm possession also helps him.  Courts in this circuit have found that the age of an offense can affect its probative value in the dangerousness analysis.  *See, e.g.*, *United States v. Norris*, Case No. 3:23-cr-572, 2024 WL 4816246, at *7 (N.D. Ohio Nov. 18, 2024); *United States v. Jennings*, Case No. 2:24-CR-20173, 2024 WL 4560602 at *4 (E.D. Mich. Oct. 24, 2024); *United States v. Green*, No. 23-cr-20506, 2024 WL 4469090 at *4 (E.D. Mich. Oct. 10, 2024).  Banks pled guilty to the attempted drug possession crime in August of 2007, and he possessed a firearm nearly 9 years later, between April and September of 2016, with no additional felony convictions during that period.  As a "commonsense" matter, the elapse of 9 felony-free years between Banks's nonviolent attempted drug possession and his firearm possession also suggests Banks was not dangerous in 2016, when he possessed a firearm.  *Williams*, 113 F.4th at 660.

In short, the most that can be reasonably inferred from the felony conviction underlying Banks's indictment is that he attempted to possess a non-trafficking quantity of crack cocaine 9 years before he possessed a firearm.  Because this offense did not risk or cause "physical harm to another person or the community," it does not support a finding of dangerousness.  *Williams*, 113 F.4th at 659.

This does not end the analysis, because "a defendant's entire criminal record" informs the dangerousness determination, "not just the specific felony underlying his § 922(g)(1) conviction."  *Id.* at 659-60.  Citing *United States v. Goins*, 118 F.4th 794 (6th Cir. 2024), the government argues that Banks's automobile-related convictions, and in particular his DUI convictions, show Banks's dangerousness "when coupled with his felony drug conviction."  (Doc. No. 69 at 3).  But a more holistic review of Banks's record confirms he is not dangerous under *Williams*.

As an initial matter, *Goins* does not control the outcome here.  Two considerations distinguish it from Banks's case.  First, *Goins* did not rely solely on the defendant's pattern of

20

conduct to find that the Second Amendment permitted his prosecution under § 922(g)(1). The defendant there was "disarm[ed] as a condition of his probation" at the time he possessed a firearm. *Goins*, 118 F.4th at 804. This was the "most important[]" factor in the Sixth Circuit's analysis of the "totality of the facts" of Goins's case. *Id.* at 804-05; *see also United States v. Raphael Williams*, Case No. 24-1409, 2025 WL 1136326 at *4 (6th Cir. April 17, 2025) (emphasizing this language from *Goins*).

For this reason, *Goins* carefully evaluated the American tradition of forfeiture laws and concluded that this history supported the defendant's prosecution under § 922(g)(1) because those laws were relevantly similar to the disarmament of "those on parole, probation, or supervised release." *Goins*, 118 F.4th at 802. So, *Goins* is inapposite because Banks was not on probation, parole, supervised release, or some other status allowing his temporary disarmament when he possessed a firearm in 2016. *Cf. Raphael Williams*, 2025 WL 1136326 at *4 (explaining *Goins* supported the as-applied constitutionality of § 922(g)(1) because the "key factors in *Goins* exist[ed]" in the defendant's case).

Second, Banks's criminal record does not resemble Goins's. In that case, the defendant had four convictions for driving under the influence that escalated in seriousness, including one arising from "a motor vehicle accident with another motorist, where Goins was transported to the hospital for injuries." *Goins*, 118 F.4th at 797. Nothing in the record here suggests Banks drove in such a highly reckless manner while intoxicated that he risked or caused injuries or a motor vehicle accident.

Rather, Banks was convicted of only two misdemeanor driving under the influence offenses, and he served a total of 8 days in jail for that conduct. For his first offense, a violation of the Toledo Municipal Code, he was given the minimum possible carceral sentence under Ohio law. *See* Toledo Mun. C. § 303.99(a)(5)(A) (providing that a DUI misdemeanor "shall be punished in accordance with" the provisions of the Ohio Revised Code governing DUI offenses). For his

21

second, a violation of the Ohio Revised Code, he received two days more than the minimum possible carceral sentence. *See* Ohio Rev. C. § 4511.19(G)(1)(a)(i) (requiring a mandatory minimum sentence of three days in jail for a misdemeanor DUI offense). The minimal sentences Banks received for these offenses indicates neither was especially serious, and although DUI offenses are certainly of concern due to their inherent recklessness, I conclude that the record does not demonstrate either offense supports a finding of dangerousness.

In all, Banks has a history of driving-related offenses attenuated from a risk to the physical safety of the public. And as I have already explained, Banks's 2007 conviction for attempted possession of crack cocaine does not support a finding of dangerousness. While Banks violated traffic laws repeatedly, and attempted to possess crack cocaine once, he has not engaged in a "dangerous pattern" of behavior risking or causing physical harm to others pursuant to *Williams*. *Goins*, 118 F.4th at 804; *see also id.* at 805 (Bush, J., concurring) (expressing doubt "in the majority's reliance on Goins's prior DUI and drug offenses as additional reasons for upholding his firearm-possession conviction"). *Goins* does not turn Banks's non-dangerous offenses into dangerous ones.

Finally, the remaining record evidence regarding Banks's criminal and behavioral history does not suggest he is dangerous. His other misdemeanor convictions show he engaged in nonviolent conduct like driving without a license, failing to wear a seatbelt, driving with an open container of alcohol, and failing to obtain a construction permit.

The conduct for which he was convicted at trial included possessing a firearm while driving in a car, possessing a firearm in various social media posts, and possessing a firearm while filming a music video. Banks's presentencing release violation—which would carry significantly circumscribed probative value regardless, coming 8 years *after* his 2016 firearm possession—involved non-dangerous conduct like attempting to travel without permission and failing to report contact

with a law enforcement officer.  I have "no trouble concluding" this conduct does not "make [Banks] dangerous" either.  *Williams*, 113 F.4th at 659.

      After examining Banks's "entire criminal record," and with appropriate "focus on [Banks's] specific characteristics," I find he has rebutted the presumption of dangerousness that attaches as a result of his 2007 conviction for attempted possession of crack cocaine.  *Williams*, 113 F.4th at 657.  None of the record evidence documenting Banks's convictions shows he "put someone's safety at risk," or "cause[d] . . . physical harm to another person or the community."  *Williams*, 113 F.4th at 659.  As the government puts it, Banks's criminal record may show "a propensity for drug and alcohol abuse."  (Doc. No. 69 at 4).  But his record does not show a propensity for physical dangerousness.

      This conclusion respects the line drawn by binding precedent between felons who are physically dangerous and those who merely exhibit poor judgment.  In *Rahimi*, the Supreme Court "reject[ed]" the argument that a person "may be disarmed simply because he is not 'responsible.'"  602 U.S. at 701 (internal citation omitted).

      Consistent with this reasoning, *Williams* held felons are "members of the political community" whose possession of a firearm is facially protected by the Second Amendment.  113 F.4th at 649.  And most importantly, *Williams* acknowledged that an individual who has been convicted of a crime punishable by at least a year in prison is not dangerous, and cannot be prosecuted under § 922(g)(1), if his criminal record does not include conduct risking or causing physical harm to others.  *See* 113 F.4th at 659.  Because Banks's criminal record shows he is not dangerous, the Second Amendment protected his right to possess a firearm between April 10, 2016 and September 23, 2016.  Section 922(g)(1) is unconstitutional as applied to him, and his indictment must be dismissed.

**IV.    CONCLUSION**

For the reasons stated above, I grant Banks's motion to dismiss the indictment.  (Doc. Nos. 59 & 66).

So Ordered.

                                s/ Jeffrey J. Helmick
                                United States District Judge